Filed 6/30/22  P. v. Adams CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B313106 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA103213) |
| v. | |
| DAVID ANTHONY ADAMS, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rogelio Delgado, Judge.  Affirmed.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant David Anthony Adams, Jr. challenges the trial court's denial of his petition under Penal Code[1] section 1170.95 for resentencing on his murder conviction. He contends that the trial court erred by summarily denying his petition without appointing counsel and without his presence in court. We affirm on the ground that any error was harmless. The record of conviction shows as a matter of law that Adams is ineligible for resentencing.

## FACTUAL AND PROCEDURAL SUMMARY

In 2015, a jury convicted Adams of one count of second degree murder (§§ 187, subd. (a), 189), and found true an allegation that he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(4).) The jury found not true an allegation that a principal intentionally discharged a firearm, proximately causing death. (§ 12022.53, subds. (d) & (e)(1).)

The following account of the facts of the case is derived from our opinion in Adams's direct appeal. (*People v. Adams et al.* (Aug. 8, 2017, B269551) [nonpub. opn.].) Adams and his codefendant, Nicholas Hempstead, were both members of Trey-57, a street gang affiliated with the Crips. The victim, Deon Davis, was a member of the PDL gang, which was affiliated with the Bloods and an enemy of Trey-57. Lisa Caesar, an associate of the Trey-57s, told Adams and his friends that Davis had forced Caesar's niece to take crystal meth and work as a street prostitute. Caesar, Adams, Hempstead, and another friend, Lonzo Eddings, went to confront Davis and try to recover the niece's car. They argued, and Adams punched Davis.

---

[1] Subsequent statutory references are to the Penal Code.

2

The owner of the house where the fight was taking place objected, and Adams suggested they go to another location. Davis willingly got into the back seat of Caesar's car, where he sat between Davis and Hempstead. They got out of the car near an alley in territory controlled by Trey-57. Davis challenged the others to a fight, Adams accepted, and they went into an alley.

"Caesar testified that, when the youths stopped in the alley, they conversed in tones so low that Caesar could not hear them. Eddings came out of the alley and told her, ' "[Hempstead] is going to shoot him." ' Caesar told Eddings, ' "I didn't come here for that" ' and 'tell him no.' Eddings returned to the alley, and, in a few seconds, Caesar heard Hempstead say, ' "Fuck that. I got him right here." ' Caesar saw that Hempstead was wearing gloves and had a black object that was the size of a handgun. Hempstead shoved Adams aside and walked toward Davis, who was deeper into the alley. Eddings began to walk out of the alley.

"Eddings testified that he had a 'weird feeling' and told Caesar, '[Hempstead] is about to do some weird shit,' and the two froze, looking at each other. Caesar said nothing; she did not direct him to tell the others not to shoot Davis. Adams walked up to them and said, ' "Start running to the car." ' Both Caesar and he began to run to the car. As they ran, Eddings heard multiple gunshots.

". . .

"Caesar testified that after Eddings told her that he thought Hempstead would shoot Davis, she 'turned around and left.' As she crossed the street to her car, she heard several gunshots that came from the alley. She got into her car and 'never looked back.' 'Within seconds' Eddings got into the car; then Adams arrived five seconds after Caesar. Caesar did not

intend to wait for Adams or Hempstead. After Caesar started the car, but before she could put the car in gear, Hempstead got into the car. During the ride, Eddings asked, ' "Are we good? We're all good, right?" '

"Eddings testified that he and Caesar reached the car about the same time and Caesar did not start the car until both Adams and Hempstead were inside. As they were driving away, Eddings looked at Hempstead and said, 'What the fuck did you do?' Hempstead answered, ' "That was for [Cook]." ' Adams and Hempstead laughed and made Crips hand signals."[2] (*Adams*, *supra*, B269551.)

Police later recovered shell casings at Adams's home that matched the casings recovered at the murder scene.

The jury at Adams's trial received instructions on first degree murder (CALCRIM No. 521); first or second degree murder with malice aforethought (CALCRIM No. 520); and direct aiding and abetting (CALCRIM No. 401); but not on felony murder or the natural and probable consequences doctrine. The trial court imposed an aggregate sentence of 36 years to life in prison. We affirmed the judgment. (See *Adams*, *supra*, B269551.)

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.), which eliminated liability for murder under the natural and probable consequences doctrine, and limited the application of the felony-murder doctrine. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) The legislation

---

[2] Joseph Cook, whom Hempstead mentioned, was Eddings's brother and had been killed in a previous shooting. Trey-57 members believed the PDL gang was responsible for this shooting.

4

also enacted section 1170.95, which established a procedure for vacating murder convictions for defendants who could no longer be convicted of murder because of the changes in the law and resentencing those who were so convicted.  (Stats. 2018, ch. 1015, § 4, pp. 6675–6677.)

Adams filed a petition for resentencing on March 29, 2021.  The trial court did not appoint counsel to represent Adams and summarily denied the petition on the ground that "the court file reflects that [Adams] was not convicted under a felony murder or a natural and probable consequences theory of culpability.  The jury was not instructed on either theory."

After the trial court denied Adams's petition, Senate Bill No. 775 (2021−2022 Reg. Sess.) (Stats. 2021, ch. 551) became effective, expanding the scope of the law and amending the procedure for adjudicating petitions under section 1170.95 in certain respects.  We assume without deciding that these amendments apply to Adams's case.

## DISCUSSION

### A.  *The Trial Court's Failure to Appoint Counsel Was Harmless*

Adams is correct that the trial court erred by denying his petition without appointing counsel to represent him.  The procedures for deciding a petition for resentencing under section 1170.95 were not clear at the time the court made its ruling, but shortly thereafter, the Supreme Court in *People v. Lewis* (2021) 11 Cal.5th 952, 962 (*Lewis*) held that the court must appoint counsel to represent the defendant in all cases where the defendant files a facially sufficient petition.

In this case, however, the failure to appoint counsel was harmless. In *Lewis*, the Supreme Court held that, to obtain a reversal, a petitioner must show that he suffered prejudice by " 'demonstrat[ing] there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.) For a defendant like Adams whose petition was denied at the first stage of review on the ground that he failed to make a prima facie case that he is entitled to resentencing (see § 1170.95, subd. (c)), this means " 'showing "it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing." ' " (*Lewis, supra*, at p. 974.)

Adams cannot meet this standard. Although "the 'prima facie bar was intentionally and correctly set very low' " (*Lewis, supra*, 11 Cal.5th at p. 972), the court may deny a petition for failure to make a prima facie case if the record of conviction shows as a matter of law that the defendant is ineligible. (*People v. Flores* (2022) 76 Cal.App.5th 974, 987 (*Flores*).) In making this determination, the court may consider the record of conviction and may draw adverse conclusions " 'if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition." ' " (*Lewis, supra*, at p. 971.) In particular, if the jury instructions did not allow for a defendant to be convicted of murder under a theory made invalid by Senate Bill No. 1437, any error in denying the defendant's petition at the prima facie stage is harmless. (*People v. Daniel* (2020) 57 Cal.App.5th 666, 677–678 (*Daniel*).) Such a defendant is "categorically ineligible for relief." (*Id.* at p. 678.)

Senate Bill No. 1437 barred almost all murder convictions where the defendant's malice is imputed on the basis of his participation in another crime. (See Stats. 2018, ch. 1015, § 2, p. 6675.) In so doing, the law "eliminate[d] natural and probable consequences liability for first and second degree murder" (*Gentile, supra,* 10 Cal.5th at p. 849) and limited the application of the felony murder doctrine. (*Flores, supra,* 76 Cal.App.5th at p. 984.) The jury in Adams's case was not instructed as to either of these doctrines.

Adams argues that he can nevertheless establish a prima facie case for resentencing. He relies on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), where the court held that, although there was no instruction on the natural and probable consequences doctrine, the instructions allowed the jury to convict the defendant of murder on a theory of imputed malice. Thus, the defendant had made a prima facie case for resentencing. The court focused on two instructions. "CALJIC No. 8.31, as given to the jury, stated that a killing is a second degree murder if '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' CALJIC No. 3.01, as given to the jury, stated that 'A person aids and abets the commission . . . of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, . . . [¶] (3) By act or

advice aids, promotes, encourages or instigates the commission of the crime.' " (*Langi*, *supra*, at p. 981.)

The court reasoned that these instructions in combination "create[d] an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) The court explained that "[t]he aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts '*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' (CALJIC No. 3.01, italics added.) However, as noted above, the second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Langi*, *supra*, at pp. 982–983.)

We need not decide whether *Langi* was correctly decided because, even assuming it was, it does not show that Adams made a prima facie case for two reasons. First, the jury instructions in Adams's case differed from those in *Langi* in crucial respects. In particular, the court did not instruct the jury,

pursuant to CALJIC No. 3.01, that it could convict Adams as an aider and abettor if it found that he acted "[w]ith knowledge of the unlawful purpose of the perpetrator." Instead, the court instructed the jury pursuant to a different pattern instruction, CALCRIM No. 401, which stated that, to convict the defendant of murder as an aider and abettor, the prosecution must prove that "[t]he defendant knew that the perpetrator intended to commit the crime." In addition, the court told the jury that, "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime." These instructions did not allow the jury to convict Adams if he merely intended to assist Hempstead in harming Davis. Instead, the jury must have concluded that Adams knew Hempstead "intended to commit" murder and that he "intended to aid and abet" Hempstead "in committing" murder.

Second, the same jury that convicted Adams of second degree murder convicted Hempstead of first degree murder. The jury instructions on first degree murder stated that the prosecution must prove beyond a reasonable doubt that the defendant "acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill." Because there was no instruction on the natural and probable consequences doctrine, the jury, to convict Adams as an aider and abettor, must have concluded that he intended to assist Hempstead in intentionally killing Davis. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 ["outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator"].)

Because the record of conviction shows as a matter of law that Adams is ineligible for resentencing, the error in denying his

petition without appointing counsel was harmless. (See *Daniel*, *supra*, 57 Cal.App.5th at pp. 677–678.)

## B. *Adams Was Not Entitled to Be Present at the Prima Facie Hearing*

Adams also contends that he had a constitutional right to be present when the trial court decided his petition. We disagree.

"A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465.) In *Lewis*, the Supreme Court held that proceedings under section 1170.95 at the prima facie stage of review are not a critical stage of the criminal process for purposes of the appointment of counsel.[3] (See *Lewis*, *supra*, 11 Cal.5th at p. 972.)

A defendant's right to be personally present in court is less absolute than his right to counsel (see *Illinois v. Allen* (1970) 397 U.S. 337, 342–344), and it would be bizarre to conclude that a defendant did not have a constitutional right to counsel for a proceeding but nevertheless had a right to be personally present in court. Furthermore, case law regarding the right to personal presence indicates that it does not apply here. "For purposes of the right to be present, a critical stage is 'one in which a defendant's " 'absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " ' " (*People v. Bryant, Smith and*

---

[3] The court in *Lewis* concluded on this basis that the defendant had only a statutory, not constitutional, right to counsel at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at p. 973.)

*Wheeler*, *supra*, 60 Cal.4th at p. 465.)  But as we have seen, at the prima facie stage, the trial court determines the defendant's eligibility as a matter of law.  Indeed, " 'factfinding involving the weighing of evidence or the exercise of discretion' " is forbidden at this stage.  (*Lewis*, *supra*, 11 Cal.5th at p. 972.)  The defendant's presence can make no difference in this determination, and his absence in no way deprives him of the opportunity to obtain relief.

## DISPOSITION

The trial court's order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



MORI, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12